Filed 1/22/15  P. v. Zapata CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ZAPATA,<br><br>    Defendant and Appellant. | B253025<br><br>(Los Ángeles County<br>Super. Ct. No. VA113297) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed as modified.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Jose Zapata appeals from convictions for murder and attempted murder. He contends the evidence was insufficient to support the jury's true findings as to carjacking, or that the crimes were committed for the benefit of a criminal street gang. Zapata also contends the court prejudicially erred in refusing to instruct the jury that the prosecution's key witness was an accomplice, and as to self-defense. Finally, Zapata contends he is entitled to additional presentence custody credits. We conclude that Zapata's final contention has merit, and the abstract of judgment must be modified to reflect additional credits. None of Zapata's other contentions has merit and, as to those, we affirm.

## PROCEDURAL BACKGROUND

By Information, Zapata was charged with one count of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and one count of attempted willful, deliberate and premeditated murder (§§ 664, 187, subd. (a); count 2).[2]

Special circumstances were alleged as to count 1, i.e., that the murder was committed while Zapata was engaged in the commission of a robbery and carjacking in violation of sections 211, 212.5, and 215, and that both offenses fell within the meaning of section 190.2, subdivision (a)(17). As to count 1, a further special circumstance was alleged that Zapata intentionally killed the victim while an active participant in a criminal street gang and the murder was carried out to further the gang's activities pursuant to section 190.2, subdivision (a)(22). As to both Counts, the Information alleged that a principal personally discharged and used a firearm (handgun) within the meaning of section 12022.53, subdivisions (b), (c), (d), (e), and (e)(1), and that Zapata committed the underlying offense for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). Also as to both counts 1 and 2, the Information alleged that Zapata personally discharged a firearm within the meaning of section 12022.53, subdivisions (b),

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Both counts were also alleged against Zapata's codefendant Erick Rodriguez, who was ultimately acquitted.

(c), and (d), and that he committed the underlying offenses for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b)(1)(C).

A jury found Zapata guilty as charged and found true special circumstance, firearm and gang allegations. Zapata was sentenced to an aggregate prison term of 90 years to life, awarded presentence credits and ordered to pay various fees and fines.

## FACTUAL BACKGROUND

*Prosecution evidence*

*Events leading up to and after the crimes*

On December 6 or 7, 2009,[3] Julio Cesar Serrano received a call from Zapata's brother, "Little Risky." Little Risky, whom Serrano knew was a gang member, asked Serrano if he knew anyone who wanted to buy a gun. Serrano spoke to his friend Kevin Gonzalez, who lived in San Francisco and wanted to buy a gun, and acted as a middleman between Gonzalez and Little Risky for the gun sale. On the evening of December 7, Serrano was with "Little Risky" and "Little Boy" (who was Zapata's codefendant Rodriguez),[4] when he received a call from Gonzalez who wanted to see the gun. Before leaving to meet Gonzalez, Serrano spent about 30 minutes in an apartment with Rodriguez and Zapata. Sometime after midnight (December 8), Serrano walked to meet Gonzalez at a store. Gonzalez was in his black BMW in the parking lot when Serrano arrived.

Serrano and Gonzalez drove to a house where "Little Risky," Zapata and Rodriguez were located, and Gonzalez unloaded some luggage. Driving in the BMW, Serrano and Gonzalez followed Zapata and Rodriguez, who drove a Lexus, to some railroad tracks on Los Nietos Road. Everyone got out of the cars at the railroad tracks. Zapata pulled a gun

---

[3] Unless otherwise stated, all additional date references are to 2009.

[4] At trial, Serrano testified that he at first mistakenly identified Rodriguez as "Clever," and Zapata as "Little Boy." Serrano later testified that his identifications were mistaken; he had the two names switched. Zapata is "Clever," and Rodriguez is "Little Boy." Our factual recitation identifies Zapata and Rodriguez to reflect Serrano's corrected identifications.

from his waistband and showed it to Gonzalez. He described that gun as "light weight," and said they were waiting for "Big Homey" to bring another one. Gonzalez and Serrano each handled the gun, which Serrano described as a .38 or .357 caliber semi-automatic, for 30 seconds before Gonzalez returned it to Zapata.

At that point a helicopter flew near. Zapata said they had to go elsewhere because it was "getting hot." Everyone got into the BMW, with Zapata and Rodriguez in the back seat, directing Gonzalez to drive to different railroad tracks in an industrial area nearby. They parked near a house and walked toward the tracks. Serrano noticed a lot of Los Nietos gang graffiti. The group talked for about 15 minutes, until Zapata told Serrano to check to see whether Big Homey was coming. After Serrano returned saying he saw no one, Zapata sent Rodriguez to see if Big Homey was coming while the others waited silently for his return.

When Rodriguez returned, Zapata stood in front of Serrano and Gonzalez, pulled out a gun, pointed it at them and told them to get on their knees. They did so. Zapata demanded the car keys, their cell phones and money. Gonzalez gave Rodriguez the car keys, and both men gave him their phones, money and wallets. Zapata asked if they had any last words. Gonzalez asked if he could call his mother or girlfriend to tell them he loved them and would not see them again. He was not allowed to make a call. Rodriguez told Zapata to "shoot him in the head." Zapata shot Gonzalez about five times. He fell face first. There were no raised voices or arguments before the shooting, and no one issued any threat. Everything seemed normal to Serrano. At some point before the shooting, Zapata said, "This is Los Nietos. What the fuck are you doing here?" At trial, Serrano said this was true, but admitted he falsely told the police that Rodriguez and Zapata had stood behind him and Gonzalez.

When Zapata shot Gonzalez, Serrano got up and ran. He was shot in his right arm and left foot as he ran, and fell. He lay on the ground until he heard Zapata and Rodriguez run away toward the parked BMW, then went into a nearby business to get someone to call 911. Police and paramedics arrived and Serrano was taken to the hospital.

4

On December 8 Serrano identified Zapata as the shooter in a six-pack lineup. He also identified Zapata as the shooter at trial. From another six-pack lineup, Serrano identified Rodriguez as someone involved in the shooting.[5]

At the preliminary hearing, Serrano testified that at the scene of the shooting, Rodriguez told Serrano he had Rodriguez's name "fucked up from the beginning" and his name was not Little Boy, but "Spitty" or "Speedy." At some point Serrano told police Rodriguez had carried a shotgun. At the preliminary hearing Serrano admitted this was not true and he told this story because he was angry that Zapata shot at him and killed his friend. Serrano had also told the police Zapata and Rodriguez had worn gloves, and that there had been a large duffle bag on the back seat of the BMW which Zapata had suggested be moved to make room for him and Rodriguez.[6] At the preliminary hearing, Serrano testified that Gonzalez had just acquired a shotgun in San Diego, which was in the BMW's trunk.

During questioning by police at the hospital, Serrano claimed he had been carjacked in front of his mother's house and forced to drive to the railroad tracks, and did not recognize the suspects. He told police he was approached by two male Hispanics. Serrano had seen Zapata in the neighborhood and talked to him before the shooting. Zapata had a tattoo on his arm that said "L.N.," and another "L.N." tattoo on the back of his head. Serrano had seen but had never spoke to Rodriguez before the evening of the shooting. Rodriguez showed Serrano a tattoo on his chest that said "Los Nietos, TMS" at the railroad tracks the night of

---

[5] On one six-pack, Serrano circled photograph number 3 and wrote: "Clever, he is the shooter." When shown this photograph at trial, Serrano admitted the photograph was of Zapata, not Rodriguez. Serrano admitted that, throughout his earlier trial testimony he had mistakenly identified Rodriguez as "Clever," but Zapata was actually "Clever." After changing his testimony, Serrano claimed that, as he ran away, he turned and saw Zapata point and fire the gun at Gonzalez. From a different six-pack photo lineup, Serrano had identified the person in photograph number 5 as "Little Boy," an individual involved in the shooting. At trial, Serrano admitted he misidentified Zapata as "Little Boy" in his prior testimony; Rodriguez is "Little Boy."

[6] At trial, the parties stipulated that, notwithstanding his testimony at the preliminary hearing, Serrano never told the police Zapata and Rodriguez had worn gloves or that there was any duffle bag in the BMW's back seat.

the shooting. Previously, Serrano said Rodriguez's tattoo was on his back, and said "Los Nietos Malos." At the preliminary hearing and at trial, Serrano testified that Rodriguez's chest bore a "Los Nietos" tattoo. Serrano's family received up to $6,000 in relocation assistance. Serrano had received about $300 himself for relocation expenses at the time of the preliminary hearing. Serrano has a tattoo that says "Sinaloa" to signify Sinaloa, Mexico, which is where his family is from. He testified he is not a gang member, does not associate with gang members and does not belong to a crew or cartel. Serrano, 23 years old at the time of trial, admitted having been convicted of a felony at age 14.

Officer Raymond Laffler was on patrol on December 8, and arrived at the industrial area on Dice Road in Santa Fe Springs around 12:22 a.m. Behind one business he found several employees and Serrano, who had been shot in an arm and a foot. Serrano was worried about a friend who had been with him. Officer Laffler found Gonzalez, who had also been shot, off the property nearby.

When Officer Guan Gorena arrived at the railroad tracks between Dice Road and Norwalk Boulevard at about 12:20 a.m., he saw a body which he described as on its knees, crouched in a fetal position, face down and leaning forward. He turned the body over and there was no response. He saw blood on the right hand, a hole in the sweatshirt and blood on the upper left chest. Forensics Specialist Chris Kraft was responsible for forensic photography, crime scene investigation, searching the scene for potential evidence, and documenting all recovered evidence, including Gonzalez's body. He found the body lying face up near a building, found four nine millimeter casings within a 20-foot radius of the body, saw numerous footprints and took photos of the business and surrounding area.

A medical examiner from the Coroner's office conducted an autopsy on Gonzalez who had two gunshot wounds, one in left upper chest and the other in his front left thigh. The cause of death was multiple gunshot wounds, the fatal shot being one to the chest that perforated Gonzalez's heart and caused a large amount of blood loss. Gonzalez had gunshot residue on his hands. Such residue can result from discharging a gun or if one's hands are in the vicinity of a firearm being fired. Based on the position of Gonzalez's body, the medical

examiner opined that Gonzalez had likely been standing when shot and bent forward to cover himself.

*Apprehension of Zapata*

On December 9, Officer Wolfe located the Lexus in which Zapata and Rodriguez had driven in a parking lot at the school Zapata attended. The officer saw the same car at Zapata's home on Francisquito in West Covina about 1:00 a.m. to 2:00 a.m. From the school, Officer Wolfe followed Zapata as he drove off in the Lexus, but lost sight of him after he pulled into the parking lot of an apartment complex on Glenoak Avenue and got out of the car. Officer Wolfe later saw Zapata return to the Lexus with another male, and they drove to the home on Francisquito. No one entered or exited the house and Zapata left again. The officer followed Zapata through several cities before Zapata got onto the freeway at which point, believing his surveillance had been compromised, he requested a traffic stop.

*Recovery of evidence*

The Lexus was taken to a police tow yard and searched by forensics specialist Kraft. He recovered a blue steel nine millimeter compact Walter P1 from between the driver's seat cushion and seat assembly. He also found 12-gauge rounds in the trunk, but no accompanying weapon. Stereo equipment (a stereo, two speaker subwoofer boxes and a Bazooka amplifier) found in the trunk was incompatible with the Lexus's sound system. Serrano identified the Lexus as the car Zapata and Rodriguez had driven, and identified the stereo equipment found in the Lexus as having been in Gonzalez's BMW. Gonzalez's BMW was recovered a few days after the shooting from a location 1.8 miles from Zapata's home. Both cars were subjected to forensic examinations. A search of the BMW's trunk by Officer Kraft yielded an installation manual for a Bazooka amplifier, and revealed cut power cables and speaker wires. Officer Kraft was able to connect the stereo equipment recovered from the Lexus to wires in the BMW.

Forensic specialists swabbed various parts of the BMW and the nine-millimeter handgun for DNA evidence. A criminalist examined several items of evidence from the BMW and the gun found in the Lexus for DNA using reference samples from Zapata, Rodriguez, Serrano and Gonzalez. A partial DNA profile taken from swabs of the gun

7

showed Zapata was a possible contributor but excluded the other three. A partial DNA sample from the BMW's steering wheel showed Gonzalez as a possible contributor and excluded the others. Partial DNA profiles taken from swabs of the interior driver side door and interior left rear door handles included a mixture of two contributors, among which only Gonzalez was included. A sample from the interior right passenger side door handle included a mixture of two contributors, of which Zapata was one and the other three were excluded. A sample from the interior right passenger side door was a mixture of two contributors, among whom only Gonzalez was a possible contributor. A firearms expert testified that he received and examined four expended cartridges, a fired bullet and a nine-millimeter firearm. The barrel of the pistol had been cut down, but the gun worked fine. He test fired the gun and, based on his testing, examination and analysis, the firearms expert determined that all the recovered ammunition came from the nine-millimeter gun.

Officers executed a search warrant at Zapata's residence on December 9. A notebook bearing Zapata's name was found near papers containing lyrics about killing people and two photographs. One photo was of two members of the Los Nietos gang and the other was of Zapata's deceased brother, who had belonged to Los Nietos.

*Gang evidence*

Officer John Draper testified as a gang expert. He was assigned to the Problem Oriented Policing team and assisted investigations on gang- and narcotics-related cases in Santa Fe Springs. He had previously worked patrol during which he had contacted gang members and conducted follow-up investigations. Officer Draper received gang training while at the academy, as well as additional formal training. He has encountered gang members on the street and in custody, and asks them about their gang affiliation, monikers and criminal history. Some gang members are reluctant to talk, others are not.

Officer Draper is familiar with the Los Nietos gang, its territory, signs, symbols, monikers and some of its tagging and criminal acts. The primary criminal activities of the Los Nietos gang include murder, assault with a deadly weapon, robbery and the sale of illegal drugs. Officer Draper has personally had contact with approximately 15 members of the Los Nietos gang, which has about 130 members total. He has also spoken with his

superiors and community members about problems with the Los Nietos gang. The gang's hand symbols form an "L" and an "N," and its tattoos and graffiti Officer Draper has seen are "LN," "Los Nietos" or "GC" (for "grandchildren," the English translation of los nietos). The gang claims the territory bordered by Los Nietos Road, Washington Boulevard, Westman and Pioneer Boulevard. Gonzalez was shot in Los Nietos territory.

Zapata has a tattoo of "LN" on the back of his head and on his hand, and has a "Southeast LN" tattoo. Zapata's forearm bears a tattoo reading "RIP Risky." Zapata's brother Jesus, who's gang moniker was "Risky," was killed in 2008. Officer Draper does not know and has not had personal contact with Zapata or Rodriguez. He was asked to investigate Zapata's possible gang affiliation. As part of his investigation he spoke to other officers who had had contact with Zapata, reviewed Zapata's field identification cards, booking photos and photos of Zapata's tattoos, and Zapata's criminal history. Officers from West Covina and Pico Rivera informed Officer Draper that Zapata claimed to be a member of Los Nietos, and his moniker was "Goofy."

Officer Draper also spoke to other officers about Rodriguez's gang affiliation, and reviewed his field identification cards, booking photos and criminal history. He learned Rodriguez also claimed membership in Los Nietos and his moniker had been "Lonely," or "Chacho," before he became known as "Little Boy." Rodriguez has Los Nietos tattoos on his back, chest and abdomen. Based on his investigation, Officer Draper opined that Zapata and Rodriguez were members of the Los Nietos gang.

Members of the Los Nietos gang were convicted of a violation of Health and Safety Code section 11378 committed in 2005 and of attempted robbery committed in 2007.

Officer Draper was shown a photograph of graffiti on the wall of the building where the shooting took place. The graffiti said "LNR" with the "R" crossed out, which signaled disrespect of a Los Nietos rival gang, "Canta Ranas."

In response to a hypothetical posed by the prosecution based on its version of events, Officer Draper opined that when two members of the Los Nietos gang took two victims' property and shot both victims, wounding one and killing the other, the crime was committed for the benefit of the Los Nietos criminal street gang. The two gang members were at the

same location before the gun transaction, worked together to commit the crimes, acted as lookouts for "Big Homey," and left the scene together. The shootings took place on Los Nietos's turf, which showed the gang's power and authority. The crime boosted the two individuals' reputation as well as that of the Los Nietos gang, and would cause rival gangs and the community to fear Los Nietos. Locals would be afraid to report the gang's crimes, which in turn allowed the gang freely to commit more crimes. The gang could maintain its territory and conduct its "business" without fear of interference.

Officer Draper testified that Gonzalez had "Joker" tattooed on his abdomen. With such a tattoo, combined with the fact that he had a shotgun in his vehicle, wanted to buy a .45-caliber gun and had marijuana in his system, Officer Draper believed there was a 60 to 80 percent chance Gonzalez was a gang member or associate, but needed more information before he could conclude that was true. Officer Draper believed that someone with a "Sinaloa" tattoo (Serrano), who was in a vehicle with a shotgun and participated in the purchase of a weapon, could be associated with a gang, but needed more information before he could draw that conclusion.

*Defense case*

Zapata did not present any affirmative evidence in his defense.

## DISCUSSION

1.      *Sufficient evidence supports the carjacking conviction*

Zapata contends the evidence is insufficient to sustain his conviction for carjacking because it failed to show he took the BMW from Gonzalez's immediate presence. We disagree.

"Generally, in reviewing a claim based on the sufficiency of the evidence, the appellate court views the record in the light most favorable to the verdict below to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, and every reasonable inference the jury could draw from the evidence is indulged. [Citation.]" (*People v. Coleman* (2007) 146 Cal.App.4th 1363,

10

1367.)  Reversal "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Zapata contends that the evidence failed to show that the BMW was within Gonzalez's immediate presence as he was a significant distance away (one or two minutes' walk), could not see the car from his location, and could not exercise physical control over it from that distance when Zapata accosted him and took the keys.  He is wrong.

"'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).)  The elements of the offense are:  (1) "[a] person had possession of a motor vehicle"; (2) "the motor vehicle was taken from his or her person or immediate presence"; (3) "[t]he motor vehicle was taken against the will of the person in possession"; (4) "[t]he taking was accomplished by means of force or fear"; and (5) "[t]he person taking the vehicle had the intent to either permanently or temporarily deprive the person in possession of the vehicle of that possession."  (CALJIC No. 9.46 (2014 ed.); CALCRIM No. 1650.)

The carjacking statute was modeled on the robbery statute, and the term "immediate presence" has been given the same expansive reading under both statutes. (*People v. Medina* (1995) 39 Cal.App.4th 643, 650 (*Medina*).)  Under the robbery statute, "[t]he generally accepted definition of immediate presence . . . is that '"[a] thing is in the [immediate] presence of a person, . . . which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it."'  [Citations.]"  (*People v. Hayes* (1990) 52 Cal.3d 577, 626–627; § 211.)  Similarly, a vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if

11

not prevented from doing so by force or fear. (*Medina*, at p. 648; § 215, subd. (a); CALCRIM No. 1650.)

In *Medina*, *supra*, 39 Cal.App.4th 643, defendant's accomplice lured the victim into a motel room where the defendant and accomplices bound the victim and took his car keys and car. The defendant challenged his conviction for carjacking, arguing that "actual physical proximity of the victim to the vehicle is required." (*Id.* at p. 649.) The court rejected the defendant's argument, explaining that the "only reason [the victim] was not in the car when it was taken . . . , was because he had been lured away from it by trick or device." (*Id*. at pp. 651–652.) There is no requirement that the victim be in or touching the vehicle when it is taken. (*Id*. at p. 650.)

Relying on the interpretation articulated in *People v. Hayes*, *supra*, 52 Cal.3d 577 and *Medina*, *supra*, 39 Cal.App.4th 643, courts have also found the victim need not be within eyesight of the stolen property to satisfy the immediate presence element. In *People v. Webster* (1991) 54 Cal.3d 411, the California Supreme Court found the immediate presence element satisfied even though the victim was lured a quarter mile away from his car before he was killed and robbed of his car. (*Id*. at pp. 440–441.) There, the court found that notwithstanding the distance, the victim's "relative proximity to the car would have allowed him to take effective physical steps to retain control of the vehicle, and to prevent defendant and his companions from stealing it." (*Ibid*.) In *People v. Harris* (1994) 9 Cal.4th 407, the court found the immediate presence element satisfied even though the victim remained guarded in his car while items were taken from his office 35 feet away and his house, which was around the corner. (*Id*. at pp. 419–423.)

In *People v. Hoard* (2002) 103 Cal.App.4th 599, 602, defendant entered a jewelry store and ordered two employees to give him the keys to the jewelry cases and to the car belonging to one of the employees. The employees complied and were then directed into a back room and bound. (*Ibid*.) Defendant took jewelry from the cases and the employee's car. (*Ibid*.) Relying on *Medina*, *supra*, 39 Cal.App.4th 643, the court stated the victim need not be physically present in the vehicle when the confrontation occurs. The court affirmed defendant's carjacking conviction by explaining: "Although [the

employee] was not physically present in the parking lot when [defendant] drove the car away, she had been forced to relinquish her car keys. Otherwise, she could have kept possession and control of the keys and her car." (*Hoard*, at p. 609.)

Zapata places heavy but misplaced reliance on *People v. Coleman*, *supra*, 146 Cal.App.4th 1363. In *Coleman*, a shop owner drove his truck to work in the morning, put the truck keys in a rear work area and drove away in a work vehicle. After the owner left, the defendant entered the shop, pointed a gun at the office manager and demanded the keys to the truck. (*Id*. at p. 1366.) The office manager went into the back of the shop, got the keys and gave them to the defendant. (*Ibid*.) The defendant was convicted of robbery and carjacking. (*Id*. at p. 1365.) The carjacking conviction was reversed. (*Id*. at p. 1374.) The court "acknowledge[d] that a carjacking may occur where neither the possessor nor the passenger is inside or adjacent to the vehicle," but said the circumstances there were "simply too far removed from the type of conduct that [the carjacking statute] was designed to address." (*Id*. at p. 1373.) The court reasoned that the office manager "was not within any physical proximity to the [truck], the keys she relinquished were not her own and there was no evidence that she had ever been or would be a driver of or passenger in the [truck]." (*Ibid*.) The *Coleman* decision turned on the element of whether the office manager had possession, not the issue of immediate presence. (*Id*. at pp. 1371–1373.) Because the manager had never had responsibility for the truck, the appellate court refused to imply a rule of constructive possession into the carjacking statute. (*Id*. at pp. 1371–1372.)

More recently, in *People v. Gomez* (2011) 192 Cal.App.4th 609, the victim was assaulted on the grounds of his apartment complex away from the parking area; the assailants beat him and either took his keys or found them on the ground during the attack, and then drove off in their own car. The assailants returned 10 or 20 minutes later, after the victim had fled into his apartment and watched the assailants try to enter the apartment. After failing to gain entry, the assailants went to the victim's truck parked about 10 feet from the apartment, used the key and drove away. (*Id*. at pp. 613–615.) The defendant argued there was insufficient evidence he took the car from the victim's

immediate presence. (*Id*. at p. 618.) Relying on *Medina*, *supra*, 39 Cal.App.4th 643, the court found that the immediate presence requirement was easily met, despite the location of the victim in his apartment 10 feet away. (*Gomez*, at p. 624.) The court held that the jury could reasonably find that the victim's fear of further assault prevented him from acting to retain possession of his truck. (*Ibid*.)

We conclude that substantial evidence established that Gonzalez's car was sufficiently within his reach or control, such that the jury could reasonably find that he could have retained possession of it had Zapata not kept him from doing so by force or fear. The car was nearby and could be reached by a short walk; the keys were on Gonzalez's person; Zapata confronted him and forced him to relinquish the keys at gunpoint, then used the keys to take Gonzalez's car after he shot him. But for Zapata's use of force, it was not unreasonable for the jury to conclude the BMW was within Gonzalez's reach or control, such that he could have retained possession of it had he not been overcome by violence or prevented by fear from doing so. The immediate presence element was thus satisfied. (Cf. *Gomez*, *supra*, 192 Cal.App.4th at p. 624.)

### 2.    *Sufficient evidence supports the finding on the gang enhancement*

Zapata contends that, apart from an expert's opinion that the crimes were committed by two members of the Los Nietos gang acting together to benefit the gang, there is insufficient evidence to support the jury's true finding that the murder was committed for the benefit of a criminal street gang under section 186.22, subdivision (b)(1)(C). He insists that by virtue of its acquittal of Rodriguez on all charges the jury necessarily found that Rodriguez "was not the alleged gang member with [Zapata]," a finding disproving the prosecution's theory that the crimes were committed for the benefit of the gang, and which "torpedoed the foundation" of the expert's opinion. We disagree.

Section 186.22 provides for a sentence enhancement where a felony is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. . . ." (§ 186.22, subd. (b)(1); *People v. Gardeley* (1996) 14 Cal.4th 605, 623.)

14

Collateral effects of a crime, including increased respect or fear of the gang and revenge, have all been found to constitute a "benefit" to the gang. (See *Gardeley*, at p. 619; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384.) Although a specific intent to promote, further, or assist in criminal conduct by gang members is required, there need not be a specific intent to benefit the gang. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

We review a challenge to a true finding on a gang enhancement for sufficiency of evidence. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224 [appellate court reviews sufficiency of the evidence to support true finding on enhancement under same standard as for a conviction].)

Gang allegations may be proven by expert testimony. (*People v. Gardeley*, *supra*, 14 Cal.4th at pp. 617–620; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.) An expert's opinion that particular criminal conduct benefited a gang by enhancing its reputation for violence can be sufficient to raise the inference that the conduct was "committed for the benefit of . . . a[] criminal street gang" within the meaning of section 186.22, subdivision (b)(1). (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 353.)

Although not every crime committed by a gang member is gang related, a crime may satisfy the first prong of section 186.22, subdivision (b)(1) if it is committed in association with or for the benefit of his or her gang. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60; *Morales*, *supra*, 112 Cal.App.4th at pp. 1197–1198.) "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*People v. Villalo*bos (2006) 145 Cal.App.4th 310, 322.) The crucial element, however, requires that the crime be committed for the benefit of, at the direction of, or *in association with* a gang. The fact that a defendant committed the charged crime in association with one or more fellow gang members is substantial evidence of the requisite "association" element. (*Morales*, at p. 1198.)

Officer Draper was asked to assume the critical facts of this case. He was then asked whether, in his opinion, such hypothetical crimes were committed for the benefit of or in association with the Los Nietos criminal street gang. Officer Draper testified that they "absolutely" were. He had knowledge of the Los Nietos gang, its graffiti and criminal activities, which included robbery, murder and narcotics sales, and had researched Zapata's and Rodriguez's memberships in Los Nietos, an affiliation each previously admitted. Officer Draper explained that the crimes involved two gang members acting in association with one another. The two gang members met at an apartment complex in Los Nietos territory, traveled together to the site of the transaction, worked together and left the crime scene together. These facts, combined with evidence that the shooting occurred on Los Nietos turf with the gang's insignia prominently displayed near where the shooting occurred, demonstrated the gang members' "power and authority." The crime benefited the gang by increasing its power in the area, and enabled it to carry on its criminal "business" without fear its crimes would be reported.

The foregoing testimony constitutes sufficient evidence from which the jury could find the gang enhancement true beyond a reasonable doubt. It shows how murdering Gonzalez—murder being one of the gang's primary activities—benefited the gang. The expert's testimony is bolstered by the fact that Los Nietos graffiti was displayed nearby (evidence the crimes occurred in the gang's territory), and testimony that Zapata said, "this is Los Nietos," before shooting.

Zapata argues that the jury could not have relied on evidence that he committed a crime in association with another gang member because, by acquitting Rodriguez "of all charges, including the special circumstance and enhancement allegations," the jury necessarily "concluded Rodriguez was not the other Los Nietos gang member." Absent evidence of the involvement of some other member of the Los Nietos gang, Zapata asserts "there was no competent evidence two Los Nietos gang members acted together." (Boldface omitted.) This logical leap is unjustified. That the jury voted to acquit Rodriguez does not show that it necessarily found he was not a member of the Los Nietos gang. The record reflects that the jury appropriately made no further findings as to

16

Rodriguez once it concluded he was not guilty of murder or attempted murder. The jury's conclusion that the prosecution failed to prove beyond a reasonable doubt that Rodriguez committed the charged offenses does not show that the jury necessarily believed he was not a member of Los Nietos gang; it simply never addressed that question. Viewing the evidence in the light most favorable to the judgment, it is quite conceivable the jury believed Rodriguez was a member of Los Nietos but did not commit the charged crimes.

*Morales*, *supra*, 112 Cal.App.4th 1176 is instructive. In that case, the defendant and two fellow gang members committed a robbery and other offenses. Based upon a hypothetical question, the gang expert testified the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang because "they involved three gang members acting in association with each other. The gang provided 'a ready-made manpower pool . . . .' That is, one gang member would choose to commit a crime in association with other gang members because he could count on their loyalty. They would 'watch his back . . . .'" "The crime would benefit the individual gang members with notoriety among the gang, and the gang with notoriety among rival gang members and the general public." (*Id.* at p. 1197.) *Morales* rejected the defendant's argument that there was insufficient evidence that he committed the offenses to benefit his gang, and instead noted the gang expert's focus was on "a crime committed, not just by a gang member, but by several gang members, acting in association with each other. Also, [the expert] did not testify that such a crime necessarily would benefit the gang, merely that it would be committed *either* for the benefit of, *or* at the direction of, *or* in association with the gang." (*Ibid.*)

In *People v. Martinez* (2008) 158 Cal.App.4th 1324, the defendant argued that the evidence was insufficient to support the gang finding because, among other things, it was not established that he or his gang cohort identified themselves as gang members while committing the charged robbery. Rejecting this assertion, the *Martinez* court noted that the gang tattoos of the two perpetrators were "clearly visible." Although the victim and a witness had "identified defendant as participating in the robbery immediately after it

17

occurred, at trial neither could remember whom he had identified. This raises a reasonable inference they were too afraid to do so at trial based on defendant's gang status . . . ." (*Id*. at p. 1333.)

As in *Morales*, *supra*, 112 Cal.App.4th 117 and *People v. Martinez*, *supra*, 158 Cal.App.4th 1324, the record reflects that the victims had reason to know Zapata and Rodriguez's gang status. They announced themselves as Los Nietos gang members, each had visible "LN" tattoos and the crimes were committed in Los Nietos's area, clearly marked by graffiti. Zapata, an admitted Los Nietos associate or member, committed murder and attempted murder while acting together with Rodriguez, another admitted gang member. Based on a hypothetical mirroring the evidence presented at trial, Officer Draper testified the crimes were committed for the benefit of and in association with Los Nietos, because they involved at least one gang member and an associate working together. Further, the crimes benefitted Zapata by elevating his notoriety within Los Nietos, and benefited Los Nietos by increasing its notoriety locally.

To the extent Zapata contends there was insufficient evidence of specific intent, we reiterate specific intent to benefit the gang is not required. There need be only "the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'" (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) If "substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68.) Here, there was evidence Zapata intended to commit the crimes in association with Rodriguez, whom he knew to be a member of Los Nietos. Thus, the jury could reasonably infer that Zapata had the specific intent to "to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

We are similarly unpersuaded by Zapata's argument that an expert opinion must be supplemented with evidence demonstrating the crime was committed to benefit a gang. As the California Supreme Court recently held: "'Expert opinion that particular

criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) The evidence adduced at trial was sufficient to support the jury's true finding on the gang enhancement.

3.    *No accomplice instruction was required*

Zapata contends the trial court prejudicially erred by failing to instruct the jury that the prosecution's key witness Serrano was an accomplice whose testimony requires corroboration and should be viewed with distrust. (CALCRIM Nos. 334, 335.) We conclude the evidence does not support a finding that Serrano was an accomplice and any error in failing to give accomplice instructions would have been harmless.

A defendant may not be convicted upon uncorroborated testimony of an accomplice. (§ 1111.) An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) An accomplice acts "'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]'" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90–91; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)

The trial court has a sua sponte obligation to instruct on these points if there is sufficient evidence that a witness is an accomplice. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) Two pattern instructions govern accomplice testimony, CALCRIM Nos. 334 and 335. An instruction modeled after CALCRIM No. 334 is appropriate when there is a dispute in the evidence regarding whether a witness is, in fact, an accomplice; an instruction modeled after CALCRIM No. 335 should be used if the evidence is undisputed or unequivocally demonstrates a witness is an accomplice as a matter of law. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1159, 1161.) The former instruction permits the jury to determine whether a witness is an accomplice and, accordingly, whether his or her testimony required corroboration and should be viewed with suspicion. The latter instruction removes the issue from the jurors' consideration, and dictates that

they consider the witness's testimony as that of an accomplice.  It was Zapata's burden to establish by a preponderance of the evidence that Serrano was an accomplice.  (*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1219.)

   *a.    The court was not required to give CALCRIM No. 335*

   Zapata contends that Serrano was an accomplice as a matter of law because he aided and abetted an illegal sale of a firearm between gang members[7] in an isolated location on one gang's turf, and the crimes of robbery, murder and attempted murder are reasonably foreseeable consequences of that offense under the natural and probable consequences doctrine.

   "The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably put in motion."  (*People v. Avila* (2006) 38 Cal.4th 491, 567.)  Accordingly, one "who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime."  (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133; *People v. Prettyman* (1996) 14 Cal.4th 248, 260–262.)  The question is "not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable."  (*Mendoza*, at p. 1133; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 106–107.)  To find a defendant guilty of a nontarget crime as "an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted,

---

   [7] There is a dispute whether Gonzalez or Serrano were gang members.  The only indication they may have been was their respective tattoos, and evidence Gonzalez got a shotgun in San Diego.  Officer Draper believed there was a 60 to 80 percent chance Gonzalez was a gang member, and that it was likely Serrano was as well.  However, Officer Draper lacked sufficient information to render a definitive opinion.

encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable consequence' of the target crime that the defendant assisted or encouraged." (*Prettyman*, at p. 254; see CALCRIM Nos. 402, 403.)

Zapata argues that, because Serrano knowingly facilitated or participated in, and could have been charged with, an illegal firearm sale between gang members, he was an aider and abettor to the natural and probable consequences of that crime, that is, robbery, murder and attempted murder. Because it follows that a natural and probable consequence of an illegal gun sale between gang members is robbery and murder, Zapata argues that Serrano could have been charged with special circumstance murder. Serrano arranged for the illegal gun sale, got the parties together, accompanied the buyer to the sale in an isolated area of Los Nietos's territory and acted as a lookout. Zapata maintains there is overwhelming evidence establishing that Serrano was guilty of directly participating in the illegal sale of firearms, or at the very least aiding and abetting that crime; therefore, he was subject to prosecution for murder under the natural and probable consequences doctrine. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913 [finding sufficient evidence that the nontarget offenses of murder and attempted murder were a natural and probable consequence of the target offense of simple assault, which defendants aided and abetted]; *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1376 [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1450 [fatal shooting was a natural and probable consequence of assault with a deadly weapon].) These cases support the proposition that a jury's finding of a factual nexus between gang-related violence and murder would be sustained on appeal against an insufficiency of the evidence claim. They do not support the proposition that a person who has some connection to a gang-related gun sale that led to robbery and murder must, for purposes of jury instructions, necessarily be deemed an accomplice.

21

Here, a reasonable juror could find Serrano participated in or intended to assist Zapata and Gonzalez in an illegal firearm sale. A reasonable juror could also conclude that robbery would ensue from a gun transaction between gang members because that crime was a natural and probable consequence of such a transaction. The problem with Zapata's argument is that a reasonable juror was not required to draw such a conclusion because the evidence was not clear and undisputed. Because it was the jury's task to decide what Serrano intended or did, if anything, regarding the initial illegal transaction, and whether robbery, murder and attempted murder were natural and probable consequences of that crime, the trial court correctly chose not to instruct the jury that Serrano was an accomplice as a matter of law.

b. *The court was not required to give CALCRIM No. 334*

There is a dispute as to whether Serrano participated in the transaction or merely accompanied his friend after putting Gonzalez in touch with Zapata and Rodriguez. It is well settled that neither mere presence at the scene of the crime which does not itself assist the commission of the crime, nor knowledge that a crime is being committed and failure to prevent it, amount to aiding and abetting. (See CALJIC No. 3.01.) Evidence showing that a person was present at the scene of a crime, drove a defendant to the scene of a crime, or observed the crime being committed, cannot by itself constitute sufficient evidence to establish that the person was an accomplice. (*People v. Sully* (1991) 53 Cal.3d 1195, 1228.) Nor does evidence showing that a person had knowledge of an impending crime necessarily make the person an accomplice. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) An accomplice for purposes of giving an accomplice testimony instruction means the person was a co-principal or an aider and abettor—one who "actually knows and *shares* the full extent of the perpetrator's specific criminal intent, and actively promotes, encourages or assists the perpetrator with the intent and purpose of advancing the perpetrator's successful commission of the target offense." (*People v. Snyder*, *supra*, 112 Cal.App.4th at p. 1220.)

The only evidence connecting Serrano to a crime is his testimony that he put Gonzalez in contact with Zapata and Rodriguez to buy a gun, and accompanied his friend

to the sale. Serrano was a victim of robbery and attempted murder himself, and ran away when Zapata began shooting. The evidence definitively establishes nothing more than Serrano's presence and is not sufficient to support an inference that he aided and abetted. The evidence points to the conclusion that it was at least disputed whether Serrano was an accomplice. The very existence of this dispute implies Serrano could also not be an accomplice.

If there is substantial evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. (*People v. Verlinde*, *supra*, 100 Cal.App.4th at pp. 1157–1159.) Substantial evidence is not any evidence, no matter how weak, but "evidence sufficient to 'deserve consideration by the jury.'" (*People v. Williams* (1992) 4 Cal.4th 354, 361; *People v. Lewis*, *supra*, 26 Cal.4th at p. 369.) The evidence on which Zapata relies to support his argument that accomplice instructions were in order was not substantial but speculative. Serrano was undeniably at the scene, had knowledge of the planned transaction and received relocation expenses. These facts, without more, mean only that he was an eyewitness. (See *People v. Stankewitz*, *supra*, 51 Cal.3d at p. 90.) Nothing in the record reasonably supports a conclusion that Serrano was an accomplice to the crimes of which Zapata was convicted, or that he played a part in robbery, carjacking, murder or attempted murder. Thus, the evidence is insufficient that Serrano aided and abetted Zapata in his crimes.

### c. Any error was harmless

Even if the trial court erred by failing to give accomplice instructions, we would find the error harmless. At trial, Serrano's testimony was repeatedly inconsistent and at odds with statements he made before trial and his previous testimony. The jury knew Serrano reversed the identities of Zapata and Rodriguez and heard inconsistencies in his identification of Rodriguez. The jury also heard inconsistencies in Serrano's description of the shooting, heard about his criminal history and knew he received relocation funds. The jury was instructed that in considering Serrano's credibility it was to take into account any prior consistent or inconsistent statements, and that it was free to disbelieve

anything he said if it found he had deliberately lied about something significant. (CALCRIM Nos. 226 [credibility], 302 [evaluating conflicting evidence], 316 [felony conviction].) We presume the jury followed these instructions. (*People v. Carter* (2005) 36 Cal.4th 1114, 1176–1177. Further, in closing argument, Zapata's counsel repeatedly emphasized credibility issues with Serrano's testimony, and his role in facilitating and participating in the gun sale. Our review of the record reveals it is not reasonably probable Zapata would have received a more favorable verdict on the charges had accomplice instructions been given. (See *People v. Box* (2000) 23 Cal.4th 1153, 1209; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Further, "[a] court's failure to instruct on accomplice liability . . . is harmless if there is sufficient corroborating evidence in the record." (*Lewis*, *supra,* 26 Cal.4th at p. 370; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.) "Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime." (*People v. Avila*, *supra*, 38 Cal.4th at p. 562.) Corroborating evidence may be slight. The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*Gonzales*, at p. 303.) Serrano's testimony was sufficiently corroborated. He testified that Zapata shot Gonzalez. A partial DNA profile taken from swabs of the gun used to kill Gonzalez showed that Zapata alone among the four people present at the scene of the shooting was a possible contributor. The police also recovered stereo equipment from Zapata's car, which Serrano identified as having been in Gonzalez's car and which the police were able to reconnect to cut cables in Gonzalez's car. The evidence is sufficient to corroborate Serrano's testimony and connects Zapata to the crimes. (*People v. Williams* (2008) 43 Cal.4th 584, 636.) Any error was harmless.

4.      *Self-defense instruction*

Zapata contends the trial court erred when it refused his request to instruct the jury on self-defense. We disagree.

### a. Relevant proceedings

Before Zapata was advised of his right not to testify, his attorney asked the court to instruct the jury on self-defense. Defense counsel based his request on "the totality of the circumstances," evidence suggesting both victims were members or affiliates of gangs who had access to or were buying firearms, and forensic inconsistencies of the crime scene. The trial court denied the request, stating:

"No, I'm not inclined to give any self-defense instruction. I don't think there's any evidence to support that. Even if we assumed that the victims were gang members, even if we were to assume that the surviving victim was a Sinaloa drug cartel member, there is no evidence that they did anything, any aggressive act toward the defendants. . . . So, no, I would not be inclined to give self-defense instructions."

After an in chambers discussion regarding the instructions, defense counsel renewed his request. He argued the jury should have a chance to consider the issue of self-defense taking all circumstances in the case into account, including the forensic evidence, the shotgun in Gonzalez's car, evidence that both victims had gang ties and were buying a firearm, inconsistencies in Serrano's story and testimony and gunshot residue found on Gonzalez's hands.

The trial court again disagreed, finding no evidence to support an instruction on self-defense or imperfect self-defense. The court observed that any firearm Serrano or Gonzalez had access to had been left in Gonzalez's car parked some distance away, and there was "no evidence that there was any quarrel, any aggressive act by either [Gonzalez] or . . . Serrano."

### b. Governing law

The doctrine of self-defense applies if one actually and reasonably believes in the need to defend oneself from imminent danger of death or great bodily injury. (*People v. Randle* (2005) 35 Cal.4th 987, 994, disapproved on another ground by *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) A homicide is justifiable if the actor possessed both an actual and reasonable belief in the need to defend. (*People v. Barton* (1995) 12 Cal.4th 186, 199–200.)

25

The trial court must instruct on issues presented by the evidence, including self-defense, if substantial evidence supports the defense. (*People v. Salas* (2006) 37 Cal.4th 967, 982; *People v. Michaels* (2002) 28 Cal.4th 486, 529.) In making this determination, the trial court must determine whether there is "evidence which, if believed by the jury, [is] sufficient to raise a reasonable doubt." (*People v. Jones* (2003) 112 Cal.App.4th 341, 351.) Any doubt as """"to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.""""" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 824.) But a jury instruction need not be given simply because some evidence is presented, no matter how weak. There is no need to instruct on a theory "'the jury could not reasonably find to exist.'" (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63; see *People v. Marshall* (1997) 15 Cal.4th 1, 40.)

c.    *No Instruction on self-defense was required*

Zapata maintains there was evidence from which the jury could have found he acted in self-defense. Specifically: (1) there was gunshot residue on Gonzalez's hands and expert testimony that he may have shot a gun or had his hands exposed to gunshot residue; (2) Serrano's testimony regarding the number of shots he heard and that Gonzalez was shot while on his knees was at odds with forensic evidence that only four casings were found, and there were no abrasions on Gonzalez's face and hands; and (3) that circumstances of the gun transaction and tattoos on Serrano and Gonzalez indicated one or both men had gang affiliations. Serrano also testified that nothing unusual happened before he and Gonzalez arrived at the location of the shooting, there were no threats or arguments, and neither he nor Gonzalez had a weapon, made an aggressive move or tried to attack. Zapata fails to explain how any of this constitutes evidence that either victim acted in a way to cause him to fear he would be killed or suffer great bodily injury. No evidence was presented from which the jury could reasonably conclude Zapata shot Gonzalez because he actually and reasonably believed he was in imminent danger. Absent such evidence, no self-defense instruction was in order. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82.) The trial court properly refused Zapata's request for an instruction on self-defense.

*5.     Additional custody credits are due*

Zapata argues the trial court miscalculated and he is entitled to additional credit for time spent in custody while the current charges were pending. (§ 2900.5.)

A defendant sentenced to state prison is entitled to credit against the term of imprisonment for all days spent in custody prior to sentencing. (*People v. Johnson* (2002) 28 Cal.4th 1050, 1053.) The trial court must calculate "the exact number of days the defendant has been in custody 'prior to sentencing.'" (*People v. Buckhalter* (2001) 26 Cal.4th 20, 30.) The record reflects that Zapata was in custody from December 9, 2009, when he was arrested, until sentencing on December 3, 2013. This was a total of 1,456 days. At sentencing, Zapata was awarded 1,442 days of custody credit. He maintains he was entitled to 24 additional custody credits (for 1,466 days).

Although Zapata did not raise the issue of the issue of calculation of credits in the trial court, the Attorney General concedes that Zapata is entitled to additional credit, but argues only an additional 14 days of credit are due under section 2900.5. We accept the concession and the Attorney General's calculation.

## DISPOSITION

The judgment is modified to reflect that Jose Zapata is entitled to an additional 14 days of presentence custody credits.  As so modified, the judgment is affirmed.  The trial court is directed to amend the abstract of judgment to reflect this modification and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.